# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SOCCER FEDERATION, INC., | ) ) ) ) | |
| Petitioner, | ) ) | 14 C 9899 |
| v. | ) ) | Judge Virginia M. Kendall |
| UNITED STATES NATIONAL SOCCER TEAM PLAYERS ASSOCIATION, | ) ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to Section 301 of the Labor Management Relations Act (29 U.S.C. § 185) and the Federal Arbitration Act, the United States Soccer Federation, Inc. seeks to vacate an arbitration award issued on September 12, 2014 in favor of the United States National Soccer Team Players Association. The Players Association filed a counterclaim for enforcement of the arbitrator's final award. U.S. Soccer moves for summary judgment, claiming that the arbitrator exceeded his authority under the LMRA as well as the Collective Bargaining Agreement and Uniform Players Agreement by relying on the parties' past practice instead of the terms of their agreement. The Players Association filed a motion for judgment on the pleadings or, alternatively, summary judgment. For the reasons set forth below, the Court grants the Players Association's motion for summary judgment[1] [37] and confirms the arbitrator's award. U.S. Soccer's motion for summary judgment [22] is denied.

---

[1] The Players Association framed its motion as a motion for judgment on the pleadings or, alternatively, summary judgment. The Court converts the motion to one for summary judgment because, in evaluating the issues now before it, the Court considered evidence submitted outside of the pleadings, including parts of the Declaration of Mark S. Levinstein and letter from Lisa Levine. *See, e.g., Rutherford v. Judge & Dolph Ltd.*, 707 F.3d 710, 713-14 (7th Cir. 2013) (holding district court erred in not converting a Rule 12(b)(6) motion to a motion for summary judgment

1

**I. EVIDENTIARY AND OTHER OBJECTIONS**

In support of their cross-motions for summary judgment, U.S. Soccer and the Players Association filed corresponding statements of undisputed material facts, responses, and replies. U.S. Soccer objects that the Players Association's Response to U.S. Soccer's Statement of Undisputed Facts and its Additional Material Facts do not comply with Local Rule 56.1(b)(3) because they are neither concise nor responsive and are otherwise objectionable as "irrelevant, argumentative, misleading, unsupported by admissible evidence." *See* Dkt. No. 44, Def. 56.1 Reply at p. 2-3; *see also* L.R. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). U.S. Soccer also objects to eight statements in the Declaration of Mark S. Levinstein, as well as to the Declaration as a whole. (*See* Dkt. Nos. 43, 47). Though the Court briefly addresses these objections below, it notes that the rulings on these objections do not impact the ultimate outcome of this matter.

The Court will not strike any portion of the Players Association's Response to U.S. Soccer's Statement of Undisputed Facts and its Additional Material Facts. While the Court has substantial discretion to demand strict compliance with the Local Rules, including that responses or additional statements be concise and responsive, a severe sanction is not warranted in this case. *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)) ("Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."). However, to the extent that the Players Association's response and additional facts "mischaracterize the contents"

---

where court considered evidence submitted outside the pleadings, including affidavits not referred to in the complaint).

of referenced documents, the Court considers the documents themselves. The Court similarly attaches no weight to legal or factual conclusions, arguments, or conjecture contained in the Players Association's response and additional facts. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008). ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts.") (internal citations omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (a party's statement of material facts submitted pursuant to Local Rule 56.1 is improper where it fails to cite to the record and is "filled with irrelevant information, legal arguments, and conjecture").

The Court next addresses U.S. Soccer's objections to the Declaration of Mark. S. Levinstein. (Dkt. Nos. 43, 47). Objection number 1 (Dkt. No. 47) is denied. U.S. Soccer objects that Levinstein "did not lay foundation that he has personal knowledge regarding the negotiation and execution of the preexisting Uniform Player Agreement that predates 1996." (Dkt. No. 47 at 2). The objected-to excerpt, however, merely refers to the starting point of negotiations for the first UPA that was executed in 1997. Levinstein began working with the Players Association in 1996 and avers that he has personal knowledge of the facts contained in his Declaration, including the negotiation of the initial UPA. It is reasonable on the facts before the Court that the Acting Executive Director and Outside Counsel for the Players Association would have knowledge of the negotiations leading to an agreement that was signed during his tenure. To the extent the statements referenced in objection number 1 are relevant, the Court will consider them.

Objection number 2 (Dkt. No. 43) is denied. Levin stein's statement that "[t]he Players Association does not regularly conduct business in Chicago, Illinois and/or in the Northern District of Illinois" is not an impermissible legal conclusion; in this case, it is a statement of fact

based on Levin stein's personal knowledge of the organization for which he is the Acting Executive Director and Outside Counsel.

Objection numbers 1, 3, 7 (Dkt. No. 43) and objection numbers 2, 4, and 8 (Dkt. No. 47) refer to statements that paraphrase or partially quote documents. The Court grants all six objections and will consider the documents themselves to the extent they are relevant. Objection number 3 (Dkt. No. 47) is granted. Mr. Levin stein's commentary on the arbitrator's award is inadmissible as the language of the award speaks for itself. The rest of the objected-to statements in objection number 3 (Dkt. No. 47) contain speculative opinions regarding U.S. Soccer's "understanding" of its relationship with the Players Association or irrelevant factual conclusions regarding the past practices of the parties. Objection number 5 (Dkt. No. 47) and objection number 4 (Dkt. No. 43) are granted because the contested statements are irrelevant and inadmissible hearsay. Objection numbers 6 and 7 (Dkt. No. 47) and objection numbers 5 and 6 (Dkt. No. 43) are denied. The objected-to information is relevant to the arbitrator's decision and will be considered, though its probative value is slight.

Finally, the Court refuses to discount the entire Declaration as inadmissible hearsay under Federal Rule of Evidence 802. Statements in a Declaration are not necessarily inadmissible hearsay when offered in support of, or opposition to summary judgment. On the contrary, Declarations are appropriate vehicles for presenting evidence to the Court in support of, or opposition to summary judgment as long as they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" therein. Fed. R. Civ. P. 56(c)(4). Mr. Levin stein's Declaration is submitted based on his "personal knowledge of the facts contained [therein]" and the Court has no reason to think him incompetent to testify on the matters stated therein. (*See* Dkt. No. 40, at ¶

1). To the extent the individual statements within the Declaration are admissible, so too is the Declaration as a whole.

## II. BACKGROUND

The underlying dispute in this case arises from the parties' disagreement over whether U.S. Soccer must seek approval from the Players Association before authorizing printed advertising materials containing the likeness of six or more players from the U.S. Men's National Team ("Print Creatives"). U.S. Soccer is a nonprofit corporation that fields seventeen U.S. National Teams, including the U.S. Men's National Team. (Dkt. No. 44, Def. 56.1 Reply at ¶¶ 1, 5). The Players Association is a labor organization and the "exclusive collective bargaining representative of all persons who are or may become members on the U.S. Men's National Team." (*Id.* at ¶¶ 6-7).

Over the course of their relationship, U.S. Soccer and the Players Association have negotiated and executed four collective bargaining agreements and uniform player agreements. (*Id.* at ¶ 19). The fourth CBA/UPA was amended in November 2011. (*Id.* at ¶¶ 11, 19). The 2011 amended version of the CBA/UPA is currently in effect and is the agreement referenced throughout this opinion. (*See id.* at ¶¶ 11, 19). The parties do not dispute the content of the CBA/UPA and this Court has reviewed both documents in their entirety. (*See* Dkt. No. 24, Exhibit A).

### A. KEY PROVISIONS IN THE CBA/UPA

Article IV of the CBA incorporates the UPA, stating: "The parties agree and acknowledge that the Uniform Player Agreement was the product of collective bargaining between the parties, and its terms in their entirety are expressly made part of this Agreement as if

5

fully set forth herein." (Dkt. No. 44, Def. 56.1 Reply at ¶ 20). Print Creatives are addressed in Section 6(f)(i) of the UPA:

> If Player's Likeness is used by a 'Partner' of the Federation (as defined in 6(h)) for any Non-commercial Use or in a Partner's advertising or promotions, and if the advertising, promotion, or Non-commercial Use includes six (6) or more members of any Federation national team (*e.g.*, team poster or collage), Federation will request, but not require, the Partner to make a contribution in an amount to be determined in the Partner's sole and absolute discretion to the applicable Player Pool(s), provided however, with respect to any use by a Partner in a 'Spot' (as defined in 6(h)), prior to such use, Federation shall provide a copy of such Spot to the Players Association for its approval, which approval shall be considered in good faith. Such uses by Partners specifically exclude any Licensing Purposes. (*Id*. at ¶ 24).

The CBA/UPA does not contain a provision concerning an approval process for Print Creatives, though Section 6(h) of the UPA considers the approval of other types of advertisements:

> Notwithstanding any other provision in this Agreement, the Players Association shall approve video commercial spots (which includes videos to be broadcast or disseminated or posted in any medium, including television commercials) ('Spots') by sponsors or partners of the Federation ('Partners') which Spots include footage of five (5) or more Players, provided the Spot identifies with reasonable prominence that the Partner is a sponsor or partner of the Federation, if the conditions set forth below are satisfied. The Spot may include footage of Players with whom the Partner has an ongoing commercial relationship, including footage created by the Partner, even if the use of the footage or the overall contexts suggests or states that the Partner has a commercial relationship with that Player (or Players). The Spot may also include footage that includes five (5) or more Players in a team setting that contains images of Players with whom the Partner does not have a commercial relationship (i.e., game footage, training footage or other footage), provided (i) no Player is featured with whom the Partner does not have a commercial relationship, provided, however, that a Player shall not be deemed to be 'featured' in a Spot solely because the Player or his name is recognizable, and (ii) the Spot does not contain language or text that states or suggests that all Players have a commercial relationship with the Partner (e.g., no use of text or language which suggests a commercial relationship between the Partner and any individual Player or all Players where such a commercial relationship does not exist; however, use of phrases referring to the National Team, such as 'the National Team' shall be permissible and phrases such as 'the eleven' or 'the starting eleven' shall be evaluated by the Players Association in good faith on a case-by-case basis). The parties agree that the intent of this section is to encourage and allow Partners to activate around the Men's National Team. (*Id*. at ¶ 26).

6

Specific procedures for resolving grievances arising from the "interpretation or application of, or compliance with," any provision or exhibit of the CBA/UPA are provided by the CBA. (*Id*. at ¶ 13). Should a grievance arise under the CBA/UPA and proceed to arbitration, Section 5.8 of the CBA instructs:

> The Impartial Arbitrator shall issue a written decision as soon as practicable, and in any event, within thirty (30) days of the close of the record. The decision of the Impartial Arbitrator will constitute full, final and complete disposition of the grievance, as the case may be, and will be binding upon the Player(s) involved and the parties to this Agreement; provided, however, that the Impartial Arbitrator will not have the jurisdiction or authority to add to, subtract from, or alter in any way the provisions of this Agreement or any Uniform Player Agreement. Furthermore, the Impartial Arbitrator will not have the jurisdiction or authority to add to, subtract from, or alter in any way the provisions of any exhibit to this Agreement or of any exhibit to the Uniform Player Agreement unless there is a conflict or inconsistency between the provisions of the exhibit and this Agreement or any Uniform Player Agreement, in which case the Impartial Arbitrator may conform the exhibit to this Agreement or the Uniform Player Agreement. In resolving grievances, the Impartial Arbitrator has the authority to interpret, apply and determine compliance with any provision of this Agreement, or Uniform Player Agreement or exhibit thereto and to award monetary damages and/or declaratory or injunctive relief. (*Id*. at ¶ 31).

With respect to what may be considered by the Impartial Arbitrator in rendering his decision, Section 7.1 of the CBA states:

> It is expressly provided that substantive bargaining discussions between the parties and their prior Collective Bargaining Agreement and Uniform Player Agreement may be offered and considered by the Impartial Arbitrator, if deemed appropriate by him or her. With that exception, it is intended that this Agreement and its exhibits shall be deemed the complete agreement between the parties and that prior drafts and writings shall be deemed merged herein and of no force or effect. Further, no understanding contained in this Agreement shall be modified, altered or amended, except by a writing signed by the party against whom enforcement is sought. (*Id*. at ¶ 28).

The scope of the parties' agreement is constrained by integration and no-modification clauses in both the CBA and UPA:

> It is expressly provided that substantive bargaining discussions between the parties may be offered and considered by the Impartial Arbitrator, if deemed

7

appropriate by him or her. With that exception, it is intended that this Agreement, its exhibits, and the Collective Bargaining Agreement, shall be deemed the complete agreement between the parties and that prior drafts and writings shall be deemed merged herein and of no force and effect. Further, no understanding contained in this Agreement shall be modified, altered or amended, except by a writing signed by the party against whom enforcement is sought. (*See id*. at ¶¶ 28-29).

Section 13(c) of the UPA also provides a no-waiver clause:

The failure of either party to insist, in any one or more instances, on the performance of any terms or conditions of this Agreement shall not be construed as a waiver or relinquishment of any rights granted hereunder or of the future performance of any such term or condition, and the obligations of the non-performing party with respect thereto shall continue in full force and effect. (*See id*. at ¶ 30).

### B. The Arbitration and Award

Pursuant to the grievance procedure set forth in the CBA/UPA, U.S. Soccer filed a grievance on August 23, 2013 over the Players Association's disapproval of a Print Creative for an El Jimadore advertisement that had been submitted to the Players Association for review. (*Id*. at ¶ 6). On February 20, 2014, U.S. Soccer withdrew its grievance and demand for arbitration. (*See id*. at ¶ 32). An attorney for U.S. Soccer contemporaneously sent an email to the Executive Director and General Counsel for the Players Association, stating that U.S. Soccer had "no contractual obligation to submit print/digital creative pieces containing the likeness of six (6) or more national team players to the Plyers Association (PA) for its advance approval" and that it would no longer be submitting Print Creatives to the Players Association for advance approval. (*See id*. at ¶ 32).

One week later, on February 27, 2014, the Players Association filed a grievance over U.S. Soccer's declaration that it would no longer be submitting Print Creatives to the Players Association for its advance approval. (*Id*. at ¶ 33). In accordance with the procedures set forth in the CBA/UPA, an arbitration hearing to resolve these issues was eventually held over the course

of six days in April and July of 2014. (*Id.* at ¶ 16). The arbitrator issued a 56-page award and opinion on September 12, 2014 in favor of the Players Association. (*Id.* at ¶ 18).

> The arbitrator framed the issue before him as:
>
> Whether the United States Soccer Federation, under the terms of the Collective Bargaining Agreement and the Uniform Players Agreement, is required by the terms of the Agreements or past dealings between the parties to submit to the United States National Soccer Team Players Association for its advance review and approval non-video print and digital creatives containing the likenesses of six (6) or more players to be used by U.S. Soccer or its sponsors in noncommercial or advertising and promotional materials? (Dkt. No. 41-7, at 6-7).

After seventeen pages of introductory and background material, the arbitrator begins the "Discussion and Conclusion" portion of his opinion. (Dkt. No. 41-7, at 20). He starts by noting: "It is well understood that an arbitrator only needs to construe the meaning of a collective bargaining agreement when the contract language is indefinite or ambiguous." (*Id.* at 20). The next section of the opinion, "The Plain Language of the CBA and UPA," concludes with the arbitrator stating:

> The CBA and UPA are, in fact, silent as to this point. There is no explicit contract language that requires U.S. Soccer to submit to such an approval process, just as there is no language laying out another process for the review of print creatives. However, the UPA clearly contemplates that the Federation's sponsors might make use of print creatives, *see, e.g.*, 6(f)(i) (Six or More Players – Use by Federation Sponsor), which historically they have, but the UPA offers no explicit guidance as to any process to follow for the approval of print creatives proposed by sponsors. The contract language is simply silent on this point, thus requiring the Impartial Arbitrator to inquire further into the parties' intent in regard to the handling of print creatives with the likeness of six (6) or more players. (*Id.* at 22-23).

The arbitrator follows this with a "Contract Construction" segment, beginning with U.S. Soccer's argument that the arbitrator did "not need to look any further than the four-corners of the contract" and including an eight-page chart highlighting "the historical development of

9

notice, review and/or approval provisions in the parties' CBA/UPA." (*Id*. at 23-32). The arbitrator later returns to the ambiguity in the CBA/UPA:

> A central issue in this matter, as already noted, is whether there is ambiguity in the parties' CBA/UPA in regard to the approval process of print creatives. It is uncontested that the contract is silent as to this point and the CBA/UPA does not offer guidance as to the intent of the parties, even though the contract clearly anticipates sponsors wishing to use print creatives with the images of six (6) or more national team players. (*Id*. at 40).

\* \* \* \* \*

> [I]t is the view of the Impartial Arbitrator that whether U.S. Soccer sent print creatives to the PA as early as 1997 or beginning later in 2001 is less relevant than whether print creatives were sent at all to the PA for review and approval, and the evidence solidly supports the proposition that U.S. Soccer sent print creatives to the PA for review and approval beginning 2001 and until ending the practice in February 2014. The question is whether this practice, spanning approximately 12 to 13 years, offers insight into the intent of the parties as to approving print creatives of likenesses of six (6) or more players that have been submitted by sponsors for review? The Impartial Arbitrator believes that it does. (*Id*. at 40-41).

The arbitrator acknowledged that it was not his role to create new rights in the parties' CBA/UPA, noting:

> [I]n fact, per Section 5.8 of the CBA, the Impartial Arbitrator does "not have the jurisdiction or authority to add to, subtract from, or alter in any way the provisions of this Agreement or any Uniform Player Agreement." Ex. PA 7. It is the role of the Impartial Arbitrator to interpret the meaning of the contract when there is ambiguity, as there is here when the contract is silent as to the procedure for the approval of print creatives submitted by sponsors, which Section 6 of the UPA certainly anticipates. The fact the parties have included specific approval language in the past into the contract is relevant, especially when considering the "provided however" language in Section 6(i) and the inclusion of an approval process for video commercial spots. However, one cannot ignore that U.S. Soccer has openly and repeatedly forwarded print creatives to the Players Association for its review and approval for more than a decade. It would defy sound judgment to draw a conclusion as to the intent of the parties by considering only actions they did not take but refusing to look squarely at actions they did take. The arbitrator's only goal is to shed light on the intent of the parties, which may be reflected by their actions and a mutually acted upon custom or past practice, which is perhaps the most widely used standard or lens relied upon by arbitrators to interpret contractual ambiguity. (*Id*. at 41).

The arbitrator ultimately entered an award in favor of the Players Association. This suit followed.

### III. STANDARD OF REVIEW

On cross-motions for summary judgment, each movant must satisfy the requirements of Rule 56 of the Federal Rule of Civil Procedure. *See Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (" 'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.' ").

**IV. DISCUSSION[2]**

The only issue before this Court is whether the arbitrator exceeded the scope of his authority under the LMRA and the terms of the CBA by impermissibly adding a term to the UPA based on the parties' past practice. (*See* Dkt. No. 22, at 13). The Court begins by emphasizing its extremely limited authority to review the decisions of arbitrators. Courts "should not review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. Therefore, an arbitration award must be enforced if it draws its essence from the collective bargaining agreement." *Titan Tire Corp. of Freeport, Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 734 F.3d 708, 716 (7th Cir. 2013) (internal quotation marks and citations omitted). "[I]t is only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference) that the award can be said not to draw its essence from the [CBA]." *United Food and Commercial Workers, Local 1546 v. Ill. Am. Water Co.*, 569 F.3d 750, 755 (7th Cir. 2009) (internal quotation marks and citation omitted). In these cases, the arbitrator is "dispensing his own brand of industrial justice." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

"We resolve any reasonable doubt about whether an award draws its essence from the [CBA] in favor of enforcing the award." *Dexter Axle Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 768 (7th Cir. 2005) (internal quotation

---

[2] The Players Association raises some concern over U.S. Soccer's use of persuasive authority that applies Illinois state law instead of federal common law. (*See* Dkt. No. 35, at 14-15). The Court finds nothing improper about U.S. Soccer's use of authority, but—to be clear—federal common law properly governs this claim and is the law applied by the Court in this case. *See Olson v. Bemis Co.*, No. 14-3563, 2015 WL 5011951, at *6 (7th Cir. Aug. 25, 2015) ("all § 301 claims… are governed by federal common law"); *see also Ethyl Corp. v. United Steelworkers of Am.*, 768 F.2d 180, 184 (7th Cir. 1985).

marks and citation omitted). "Thus, we will vacate only if there is no possible interpretive route to the award." *NIPSCO v. United Steelworkers of Am.,* 243 F.3d 345, 347 (7th Cir. 2001) (internal quotation mark and citation omitted). Of course, the reviewing court should also vacate the arbitration award where "the arbitrator's interpretation of the collective bargaining agreement was contrary to public policy." *Titan Tire Corp.*, 734 F.3d at 716.

### A. Essence of the Award

In this case, the arbitrator's award must be confirmed. The arbitrator was faced with determining whether U.S. Soccer was required to submit Print Creatives to the Players Association for approval, despite the existence of a CBA/UPA that contained no "specific contractual provision that requires U.S. Soccer to submit print creatives of six (6) or more players to the Players Association for its approval before allowing sponsors to publish and/or display said advertising." (*See* Dkt. No. 41-7, at 20-22). In making this determination, the arbitrator did not "disregard the contractual language and dispense his own brand of industrial justice, nor did he exceed his authority in rendering his decision." *See United Food*, 569 F.3d at 755. On the contrary, the arbitrator considered the CBA/UPA, interpreted the CBA/UPA, and reached a conclusion. He did exactly what the parties bargained for under the CBA/UPA. (*See* Dkt. No. 44, Def. 56.1 Reply at ¶¶ 28, 31).

"[A]s long as an arbitrator's award is based on her interpretation of the contract, a court cannot disturb it. All that is required is that the arbitrator's interpretation [of the collective bargaining agreement] is derived from the language of that agreement." *Jasper Cabinet Co. v. United Steelworkers of America, AFL-CIO-CLC, Upholstery and Allied Div.*, 77 F.3d 1025, 1029 (7th Cir. 1996) (internal quotation marks and citations omitted); s*ee also Clear Channel Outdoor. Inc. v. Int'l Unions of Painters & Allied Trades, Local 770*, 558 F.3d 670, 675 (7th Cir.

2009); *United Food*, 569 F.3d at 755. Where an arbitrator finds an ambiguity in the agreement, he may consider evidence outside the agreement—including evidence of past practices—to resolve the same. *See, e.g., NIPSCO*, 243 F.3d at 348 (An arbitrator cannot add terms to a contract; he is, however, "empowered to fill gaps left in contracts."); *Judsen Rubber Works, Inc. v. Mfg., Prod. & Serv. Workers Union Local No. 24*, 889 F. Supp. 1057, 1063 (N.D. Ill. 1995) (Castilo, J.) (citing *Chicago Web Printing Pressmen's Union, No. 7 v. Chicago Newspaper Publishers' Ass'n*, 772 F.2d 384 (7th Cir. 1985) (reliance on past practice proper where agreement was silent on particular issue)).

U.S. Soccer insists that, in reaching his decision, the arbitrator disregarded the plain language of the CBA/UPA in favor of past practice and that there is "no interpretive route from the CBA/UPA to the Award." It maintains that the award is derived, not from the language of the contract, but solely from past practice—thereby impermissibly "drawing its essence" from past practice rather than the language of the agreement. This argument, however, is belied by both the structure and language of the arbitrator's decision.

The arbitrator broke the discussion section of his opinion into four subsections mirroring classic inquiries of contract interpretation: "The Plain Language of the CBA and UPA;" "Contract Construction;" "Past Practice and Custom;" and "Contractual Prohibitions." Of course, were these labels merely window dressing for the arbitrator's policy desires, he would have exceeded the scope of his authority and his award would be vacated; that is not the case. *See Anheuser-Busch, Inc. v. Beer Workers Local Union 744*, 280 F.3d 1133, 1138 (7th Cir. 2002). The arbitrator recognized that the CBA/UPA did not contain a provision regarding an approval process for Print Creatives. He found, however, that an ambiguity existed with respect to an approval process because the agreement clearly contemplated the use of Print Creatives:

14

> The CBA and UPA are, in fact, silent as to this point. There is no explicit contract language that requires U.S. Soccer to submit to such an approval process, just as there is no language laying out another process for the review of print creatives. **However, the UPA clearly contemplates that the Federation's sponsors might make use of print creatives,** *see, e.g.*, **6(f)(i) (Six or More Players – Use by Federation Sponsor), which historically they have, but the UPA offers no explicit guidance as to any process to follow for the approval of print creatives proposed by sponsors.** The contract language is simply silent on this point, thus requiring the Impartial Arbitrator to inquire further into the parties' intent in regard to the handling of print creatives with the likeness of six (6) or more players. (Dkt. No. 41-7, at 22-23) (emphasis added).
>
> * * * * *
>
> A central issue in this matter, as already noted, is whether there is ambiguity in the parties' CBA/UPA in regard to the approval process of print creatives. It is uncontested that **the contract is silent as to this point and the CBA/UPA does not offer guidance as to the intent of the parties, even though the contract clearly anticipates sponsors wishing to use print creatives with the images of six (6) or more national team players**. (Dkt. No. 41-7, at 40) (emphasis added).

The CBA/UPA contemplated the use of Print Creatives, but contained no provision regarding their approval. Of course, the arbitrator did not expressly state that the agreement's silence on this point created an ambiguity. Indeed, U.S. Soccer argues very persuasively that the arbitrator's interpretation may have been unsound, at times invoking the terms "silence" and "ambiguity" far too cavalierly. This is not enough. "[T]he question before a federal court is not whether the ... arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract." *Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment v. Union Pac. R.R. Co.*, 522 F.3d 746, 757 (7th Cir. 2008) (quotations omitted). U.S. Soccer has not persuaded the Court that the arbitrator's reasoning "was not a possible interpretive route." *See NIPSCO*, 243 F.3d at 348. An arbitrator need not flag his opinion with magic words of interpretation. *See, e.g., Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1505-06 (7th Cir. 1991) ("…the interpretive route here is clear. The arbitrator's

failure to mark it is not a defect for which a court asked to set aside the award can provide a remedy."). It is sufficient that, when read as a whole, the opinion demonstrates that the arbitrator performed an honest contract analysis. *See id.*; *Masco Corp. v. Prostyakov*, 558 F. App'x 685, 688 (7th Cir. 2014) ("[J]udicial review of an arbitral is extremely limited; it is so narrow that we have wondered whether 'review' might be a misnomer."); *Int'l Union of Operating Engineers, Local 139, AFL-CIO v. J.H. Findorff & Son, Inc.*, 393 F.3d 742, 745 (7th Cir. 2004) ("…only a decision to ignore or supersede language conceded to be binding allows a court to vacate the award. There is a big difference-a clear difference, a plain difference-between misunderstanding and ignoring contractual language.").

U.S. Soccer relies heavily on the analysis set forth in *Anheuser-Busch* to support its position that the arbitrator should have confined his analysis to the four-corners of the CBA/UPA and that evidence of past practice was "absolutely irrelevant." The facts of that case, however, are readily distinguishable from the circumstances at bar. In *Anheuser-Busch*, the underlying contract contained a provision expressly delineating a two-tiered commission payment structure. *See Anheuser-Busch, Inc.*, 280 F.3d at 1134. Despite the presence of that express provision, a merger clause, and an arbitration clause, the arbitrator relied on the parties' past practice to find a different payment structure than the two-tiered approach set forth in the agreement. *See id.* at 1141. In this case, there is no such defiance of an express provision. The arbitrator did not read the CBA/UPA and then blatantly disregard the express wishes of the parties in favor of some other practice. He read the agreement; found that it did not contain a provision regarding the approval of Print Creatives, despite clearly contemplating the use of the same; and looked outside the agreement to determine the parties' intent.

This Court appreciates that "[c]arefully written, well-reasoned, and thoroughly negotiated contracts are presumptively complete" and that the presence of integration, no-modification, and no-waiver clauses—as exist in this case—is "further strong evidence that the parties intended the writing to be the complete and exclusive agreement between them." *Id.* at 1141 (internal quotation marks and citation omitted). Where an ambiguity exists, however, an arbitrator may look at evidence of past practices to resolve the ambiguity. *See, NIPSCO*, 243 F.3d at 348; *Judsen Rubber Works, Inc.*, 889 F. Supp. at 1063 (citing *Chicago Web Printing*, 772 F.2d 384). Courts cannot vacate arbitration awards merely because an arbitrator writes an unsound decision with careless language and rule statements. *See Chicago Typographical*, 935 F.2d at 1506 (subjecting arbitration opinions to "beady-eyed scrutiny" might create disincentives for arbitrators writing opinions at all). And, this Court cannot conclude that the arbitrator's reliance on past practice fell outside his authority to interpret and apply the terms of the parties' CBA/UPA. Accordingly, the Court finds that the arbitrator acted within the scope of his authority and that his award does "draw its essence" from the CBA/UPA.

### B. Contractual Prohibitions

That the CBA contains integration, no-waiver, and no-modification clauses does nothing to save U.S. Soccer's bid to vacate this award. They are relevant, as mentioned above, to whether the arbitrator was prohibited from looking beyond the CBA/UPA to resolve an ambiguity, but beyond that they warrant no special consideration by this Court. The arbitrator considered all three clauses in issuing his award and, right or wrong, analyzed and determined whether they barred his consideration of evidence beyond the CBA/UPA. (*See* Dkt. No. 41-7, at 53-54). This was all he was required to do. *See Wise v. Wachovia Sec., LLC*, 450 F.3d 265, 269 (7th Cir. 2006) ("When parties agree to arbitrate their disputes they opt out of the court system, and when

one of them challenges the resulting arbitration award he perforce does so not on the ground that the arbitrators made a mistake but that they violated the agreement to arbitrate, as by corruption, evident partiality, etc.-conduct to which parties did not consent when they included an arbitration clause in their contract,"), cert. denied, 127 S. Ct. 582 (2006); *Lefkovilz v. Wagner*, 395 F.3d 773, 782 (7th Cir. 2005) (an objection to the merits of the arbitrator's decision is not grounds for vacating the award).

The arbitrator ultimately concluded that the integration and no-modification clauses did not bar his consideration of evidence beyond the CBA/UPA because he was resolving a contractual ambiguity. (*See* Dkt. No. 41-7, at 53-54). He found the no-waiver clause similarly inapplicable because the benefit of the approval process at issue was of "peculiar personal value to the employees." (*See id*.) This Court does not sit in judgment over whether the arbitrator's contract analysis was good or bad; it is sufficient merely that the arbitrator analyzed these provisions and reached a determination, which he did. *See Ethyl Corp.*, 768 F.2d at 184 ("… so long as the award is based on the arbitrator's interpretation—unsound though it may be—of the contract, it draws its essence from the contract.")

## CONCLUSION

For the foregoing reasons, the Players Association's motion for summary judgment [37] is granted and the arbitration award is confirmed. U.S. Soccer's motion for summary judgment [22] is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 9/29/2015

18